971 So.2d 363 (2007)
STATE of Louisiana
v.
Kenneth VINCENT.
No. 07-KA-90.
Court of Appeal of Louisiana, Fifth Circuit.
October 16, 2007.
*365 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Andrea F. Long, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Kenneth Vincent, Grayson, LA, pro se, Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
*366 WALTER J. ROTHSCHILD, Judge.
On November 20, 2002, the Jefferson Parish District Attorney filed a six-count bill of information against the defendant, Kenneth Vincent, and his co-defendant, Sandra D. Gayle ("Gayle").[1] Counts one, two, three, and five charged the defendant with distribution of hydrocodone, in violation of LSA-R.S. 40:967(A). Count six charged him with distribution of oxycodone, in violation of LSA-R.S. 40:967(A), and count four charged him with distribution of alprazolam, in violation of LSA-R.S. 40:969(A). The defendant pled not guilty at arraignment.
Numerous pre-trial motions were filed, including a motion to recuse the trial judge. After the motion to recuse was granted, the case was reallotted to another trial judge. Thereafter, the matter came for hearing on defendant's motion to suppress identification and evidence, which was denied.
On April 6, 2005, the defendant proceeded to trial before a twelve-person jury, and on April 7, 2005, the jury found him guilty as charged on all counts, except count two, where the jury returned a responsive verdict of attempted distribution of hydrocodone. On April 18, 2005, the trial judge sentenced the defendant to imprisonment at hard labor for 15 years on counts one, two, three, and five and 10 years imprisonment at hard labor on counts four and six, with the sentences to be served concurrently with each other. The defendant filed a motion for appeal, which was granted.
FACTS
At trial, Agent Caracci of the Jefferson Parish Sheriff's Office testified that he and other officers arranged an undercover drug sale from the defendant and Gayle. A confidential informant introduced an undercover officer, Deputy Gordon, to the defendant and Gayle on September 10, 2002 at the Sav-A-Center parking lot on Clearview Parkway in Metairie. Agent Caracci had the parking lot under surveillance and observed Deputy Gordon enter a green Mazda driven by Gayle and occupied by the defendant. Deputy Gordon testified that, after she entered the vehicle, she purchased 20 Vicodin pills from the defendant. Dan Waguespack, an expert forensic scientist with the Jefferson Parish Crime Lab, testified that these pills contained hydrocodone. On September 12, 2002, Deputy Gordon viewed a photo lineup and identified the defendant as the man who sold her the pills.
On September 13, 2002, Deputy Gordon spoke to the defendant on the telephone and arranged a meeting at Pickles Sports Bar, which is located at the corner of Barry Street and Jefferson Highway. Agent Caracci set up surveillance of 235 Barry Street, where the defendant and Gayle resided, which was very close to Pickles. Gayle and the defendant exited their residence, and Gayle drove to Pickles Sports Bar. Deputy Gordon testified that she purchased pills from Gayle on this occasion. Mr. Waguespack testified that these pills tested positive for hydrocodone.[2]
On September 18, 2002, Deputy Gordon spoke to the defendant over the telephone to purchase 20 "HP's," which Deputy Gordon explained meant Vicodin. Again, Agent Caracci observed Gayle, accompanied by the defendant, drive from 235 Barry Street to Pickles Sports Bar. Deputy *367 Gordon testified that she entered the vehicle and purchased pills from the defendant. Again, Mr. Waguespack testified that these pills contained hydrocodone. At trial, the State played the tape of the September 18th telephone call between the defendant and Deputy Gordon.
On September 27, 2002, Deputy Gordon spoke with the defendant over the phone to purchase 50 "HP's." Deputy Gordon told the defendant she had $500 and asked how many "bars" she could buy with the rest of the money. Deputy Gordon explained that "bars" meant Zanbars. The defendant told her the HP's would cost $300 and she could get 40 "bars" with $200. This recorded conversation was also played for the jury. As with the previous transactions, Agent Caracci observed Gayle and the defendant go to Pickles Sports Bar. When she arrived at Pickles, Deputy Gordon purchased 50 pills that tested positive for hydrocodone and 40 pills that tested positive for alprazolam from the defendant in exchange for $500.
Between September 30, 2002 and October 1, 2002, Deputy Gordon engaged in a series of phone calls with the defendant and Gayle to buy some "O's," which Deputy Gordon explained meant Oxycontin. Mr. Waguespack testified that Oxycontin is the brand name for pills containing a high dose of oxycodone. On October 1, 2002, the police followed the defendant and Gayle from their residence to a doctor's office in Slidell, a pharmacy in Destrehan, and then to Pickles, where they met with Deputy Gordon. Deputy Gordon testified that the defendant gave her a brown bottle containing 30 pills in exchange for $750. Mr. Waguespack testified that these pills testified positive for oxycodone.
Agent Caracci testified that the defendant and Gayle then went to several different Eckerd's stores and to a Home Depot, where the police stopped and detained them. Agent Caracci testified that Gayle consented to a search of the vehicle. The police found seven pill bottles in the vehicle, two of which were in the defendant's name. One of the bottles bearing the defendant's name contained pills that tested positive for hydrocodone, and the other bottle contained Soma. A search of the defendant upon arrest yielded $840 from his pocket, $750 of which was the pre-recorded money Deputy Gordon used in the last purchase.
Agent Caracci testified that, after the defendant was incarcerated, the defendant told him that he wanted to give some information to the police. However, Agent Caracci testified that the police were not interested in working with the defendant, due to the nature of his charges.
The defendant testified that he and Gayle were in a relationship in the 1970's and, after he was released from prison in November of 2001,[3] they resumed their relationship in December of 2001. The defendant testified he was under the impression that Gayle was a nurse's aide, but later discovered that she was selling prescription medication. Defendant claimed that he had attempted to sever their relationship, but Gayle pressed domestic violence charges against him in an attempt to prevent him from leaving her. The defendant said he was arrested and went to jail. After he was released, he attempted to leave Gayle again, but she pressed domestic violence charges against him again and he went to jail. According to the defendant, Gayle told him she would rather see him in jail than for him to leave her.
The defendant testified that he told his mother and sister about Gayle's threats. *368 He said he called the F.B.I. in July of 2002 to report that he was being forced into a relationship with Gayle, who was selling prescription pills. The defendant claimed the agents told him that they would investigate and that he would not be prosecuted if what he said was true. The defendant said he believed that the F.B.I. had set up the drug transactions in response to his calls and that he could not terminate the relationship until Gayle was arrested. The defendant stated that the F.B.I. never returned any of his telephone calls, and he did not know the names of the agents with whom he spoke.
The defendant's mother testified that she observed the defendant telephone the F.B.I. at her residence in July of 2002, but she never received a return call. The defendant's sister testified that she was staying with her mother in July of 2002 and observed the defendant telephone the F.B.I. She stated that, a few days later, an F.B.I. agent called the house and asked for the defendant. She answered the phone and handed it to the defendant.
DISCUSSION
On appeal, in his third assignment of error, the defendant argues that the evidence was insufficient to support the jury's verdict. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). Accordingly, we will address the defendant's third assignment of error before the other assignments.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
The defendant was convicted of three counts of distributing hydrocodone, in violation of LSA-R.S. 40:967(A), one count of distributing oxycodone, in violation of LSA-R.S. 40:967(A), and one count of distributing alprazolam, in violation of LSA-R.S. 40:969(A). Pursuant to those statutes, the State was required to prove that defendant knowingly or intentionally distributed the above-named drugs. Distribution of a controlled dangerous substance is a general intent crime. State v. Pierre, 03-1306 (La.App. 5 Cir. 2/23/04), 869 So.2d 206, 211, writ denied, 04-0959 (La.10/1/04), 883 So.2d 1006. General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. LSA-R.S. 14:10(2).
The defendant was also convicted of one count of attempted distribution of hydrocodone, in violation of LSA-R.S. *369 14:27 and 40:967(A). To be found guilty of attempted distribution of hydrocodone, a defendant must have a specific intent to distribute hydrocodone and do or omit an act for the purpose of and tending directly toward the accomplishing of his object. See State v. Housley, 04-347 (La.App. 5 Cir. 9/28/04), 884 So.2d 1204, 1207. Specific criminal intent exists "when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Lee, 03-901 (La.App. 5 Cir. 12/9/03), 864 So.2d 654, 659.
The defendant contends that the evidence was insufficient to support his convictions because the State failed to prove that he had the criminal intent to distribute the controlled dangerous substances. The defendant argues that he was a participant in the transactions because he believed he was following the F.B.I.'s instructions. The defendant presented this hypothesis of innocence at trial. In returning the guilty verdict, the jury obviously rejected it and found the State's witnesses were more credible than the defendant's witnesses.
Although the defendant and his family members testified that he contacted the F.B.I., the defendant never made any other showing that he contacted the F.B.I., or more importantly, that he was acting under the F.B.I.'s instructions. In addition, the defendant's testimony conflicted with his sister's testimony, who said that the F.B.I. called to talk to her brother, while the defendant denied any return calls.
The Louisiana Supreme Court has stated that the pertinent question on review is not whether the defendant's hypothesis of innocence offered a reasonable explanation for the evidence at trial but whether jurors acted reasonably in rejecting it as a basis for acquittal. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517, 520. It is the role of the fact-finder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Smith, 04-199 (La.App. 5 Cir. 6/29/04), 877 So.2d 1123, 1134, writ denied, 04-2081 (La.1/7/05), 891 So.2d 669. In light of the evidence at trial, we find that the jury rationally rejected the defendant's hypothesis of innocence.
After reviewing the record and the applicable law, we conclude that the testimony and evidence was sufficient to establish all of the essential elements of the crimes of which the defendant was convicted beyond a reasonable doubt. Accordingly, because the evidence supports the defendant's convictions under the Jackson standard, this assignment of error is without merit.
In his first assignment of error, defendant asserts that the trial court erred in denying his motion to suppress the evidence, because there was no probable cause to believe that contraband would be found at his residence. The State responds that the trial judge properly denied the motion to suppress because no evidence was seized pursuant to the search warrant for the defendant's residence.
According to LSA-C.Cr.P. art. 703(D), the defendant generally has the burden of proving the grounds of a motion to suppress:
On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
*370 Although the defendant contends that the search warrant for his residence was issued without probable cause, the defendant does not point to any evidence that was seized pursuant to that warrant. Because the record of the suppression hearing does not reflect that any evidence was seized pursuant to the search warrant for the defendant's residence, the trial judge could not have granted a motion to suppress that evidence. As such, the defendant failed to meet his burden of proving the allegations of his motion to suppress the evidence as required by Article 703(D). Accordingly, this assignment of error is without merit.
In his fourth assignment of error, which defendant submitted pro se, he asserts that "[t]he trial court erred in denying the Motion To Suppress The Evidence based on defected [sic] search and arrest warrants."[4] He contends that the search and arrest warrants were facially defective because the warrants do not clearly reflect the dates they were issued.
At the suppression hearing, Agent Caracci testified that he obtained an arrest warrant for the defendant after the first undercover purchase. Agent Valley testified that arrest warrants were obtained after each undercover purchase.
Agent Valley testified that he obtained a search warrant for the defendant's residence at 235 Barry Street. He explained that he may have prepared the warrant earlier, but that the judge filled in the actual date it was issued, which was the 30th of September. The search warrant was executed on October 1, 2002. Although Agent Valley identified an exhibit shown to him by the State as the search warrant for the residence, the record does not reflect it was admitted into evidence.
After the testimony, the defendant urged the trial judge to determine whether the date on the search warrant affidavit was timely in relationship to the search. The trial judge stated in part as follows:
THE COURT:
With respect to the date on the warrant, judging from the pens, it appears that the detective might have written the wrong date and it looks like Judge Windhorst corrected it. In any event, it's clear that the 30th is what it's supposed to stand out as opposed to, I guess, that's a 20 underneath or a 25?
. . .
THE COURT:
29, rather. It's a 29, you're right. I think that's what the evidence is. So, I think that the search was timely.
Based on the evidence before us, we agree with the trial judge that the search was timely. The arrest warrants were not introduced at the suppression hearing and, unlike the search warrant, the trial judge did not discuss the dates of the arrest warrants. Therefore, the claim that the arrest warrants were facially defective cannot be reviewed on appeal.
Our review of this matter reveals no valid basis upon which to disturb the trial judge's ruling denying the motions to suppress. Accordingly, this assignment of error is without merit.
In his second assignment of error, the defendant contends that the trial judge erred in denying his mistrial motion based upon an alternate juror's comments. The State responds that there was no prejudice to the defendant.
While the evidence was published to the jury, Ms. Giaconne, the alternate juror, noticed that the case of one of the audio tapes contained a reference to "Sandra *371 Gale" as the undercover officer, as opposed to Veronica Gordon.[5] Ms. Giaconne questioned the trial judge as follows:
MS. GIACONNE:
My question pertains to the first three pieces of evidence that I looked at. The first case was a tape and it indicated that the agent was Sandra Gale instead of Veronica Gordon on the tape.
THE COURT:
Okay. We can'tI mean, we can't comment on the evidence.
MS. GIACONNE:
Okay. Well, that's my observation when I looked at that. So, that is totally, you know to me, it's incorrect.
THE COURT:
Alright. Wait, don't tell meyou can'tdon't comment onyou can't comment on any of the evidence right now. Okay. You're looking at the evidence, if you have those thoughts then you can think it all you want. I would encourage you, as I stated before, to keep an open mind and listen to all the testimony, look at all the evidence. View it altogether because you haven't heard all the evidence yet. So, once you get it altogether, then kind of start forming your opinion after you have viewed all of the evidence. Okay. Those are things that if and when you deliberate, you will discuss with your fellow jurors.
MS. GIACONNE:
Another question I have
THE COURT:
Don't, don'tyou can ask a question, but try not todon't comment on anything, any of the evidence.
MS. GIACONNE:
Well, I just don't know the process in these particular bags, and it was the chain of custodyand I don't know whether to expect that or not, and at what point do we find out that information?
THE COURT:
Okay. Alright. I can't comment on any of that either. I mean I will tell you this, take this caseforget about T.V. and I don't know where you're getting the questions you're asking, but I mean view this evidenceif you think that something is missing, then you know, you can rely on your common sense. But you know, don't kind of analogize this to a Law and Order episode or something like that. Okay.
MS. GIACONNE:
I may take offense to that.
THE COURT:
I don't mean to offend you.
MS. GIACONNE:
Because I'm very detailed and that's something that I noticed and it's a question that I had.
THE COURT:
And, that's wonderful. I don't mean to offend you, I'm just saying, you know, view this case on its own. You can use your common sense, and if you're detailed, that's wonderful, that's great you know, more power to you. But just never mind, forget it. Alright. Take your time. Whenever y'all are ready, just let me know.
. . .
THE COURT:
First of all, let me tell y'all this. If I offended anybody, I apologize. It's not *372 my intentions. I thinkI hope you will see by the time this is over with that my staff and I, we really do bend over backwards to try to make this a positive experience for you, you know so that you'll want to come back. So, I do appreciate what y'all are doing. Without y'all, the system doesn't work. Okay. So, I mean that's the candy and I mean I really do bend over backwards to try to make you enjoy this. I really do. If I offended you, ma'am, I apologize. I know thatI think at least that you're . . . the questions you were asking kind of made meI didn't know where you got them. I didn't mean to imply thatall I'm saying is this, I legally cannot comment on the evidence. What the attorneys say is not evidence. The evidence comes from the stuff you just looked at and from that witness stand. I can't, by law, tell you, oh, well that means XYZ, and if you didn't find a chain of custody, then you should do ABC. We can't do that kind of stuff.
MS. GIACONNE:
Well, I don't know that unless I ask.
THE COURT:
And that's why I'm telling you. But in other words, when you start bringing up legal terms it makes me nervous because I can't comment on it. Okay.
MS. GIACONNE:
I accept your apology, and we'll go on.
THE COURT:
But more importantly, do you understand what I'm telling you. I can't comment on any of the evidence.
MS. GIACONNE:
That's fine.
THE COURT:
And the only questions I can answer are I didn't see Exhibit 2, do you know where it is? You know, I dropped the bottle, what should I do? That's the kind ofI mean functional questions I can answer. But as far as that kind of stuff, what weight should I give this? I can't answer any of that stuff. Okay. This is very important. The state has put on its case and rested. We still have to hear the defendant's case, if there is one . . .
Thereafter, an unrelated discussion was held at the bench with the trial judge, another juror and the attorneys. When the matter was concluded, the defendant moved for a mistrial on the basis of Ms. Giaconne's comments. The trial judge denied the mistrial motion, stated Ms. Giaconne's comments were harmless, and pointed out he had sufficiently admonished the jury. The trial judge also questioned whether the objection was timely, noting that the defendant did not immediately object. The defendant responded that he waited to move for a mistrial outside of the jury's presence. After the jury returned to the courtroom, the trial judge admonished the jury again.
Under LSA-C.Cr.P. art. 775, "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771." LSA-C.Cr.P. art. 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not *373 material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
LSA-C.Cr.P. art. 771 provides the law regarding admonitions:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Smith, 04-340 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. Id.
The remarks in question were not within the scope of LSA-C.Cr.P. art. 770 and, therefore, a mistrial was not mandatory. If anything, defendant was only entitled to an admonition under LSA-C.Cr.P. art. 771. A review of the record shows that the trial judge thoroughly admonished the jury to disregard Ms. Giaconne's remarks and to consider all of the evidence as a whole at the conclusion of the case. Further, as pointed out by the State, Ms. Giaconne's comments under these circumstances recognized a perceived weakness in the State's case, not the defendant's. Because there is no showing that defendant was prejudiced by these comments, the trial judge did not abuse his discretion in denying a mistrial, and this assignment of error is without merit.
In his fifth assignment of error, the defendant argues that he did not receive effective assistance of counsel during pretrial proceedings. In this pro se assignment, the defendant claims his trial attorney was ineffective for failing to adequately investigate the case and pursue pre-trial discovery to establish his defense that he was promised immunity from the F.B.I. in exchange for his cooperation with the investigation of Gayle.
*374 An ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. State v. Taylor, 04-346 (La. App. 5 Cir. 10/26/04), 887 So.2d 589, 595. When the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised by an assignment of error on appeal, it may be addressed in the interest of judicial economy. Id. Where the record does not contain sufficient evidence to fully explore a claim of ineffective assistance of counsel, the claim should be relegated to post-conviction proceedings under LSA-C.Cr.P. arts. 924-930.8; State v. Taylor at 595.
In the present case, the record is insufficient to address the defendant's claims of ineffective assistance of counsel. As such, these claims are more appropriately raised in an application for post-conviction relief and cannot be considered on appeal.
Finally, the defendant requests an error patent review. This Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). After conducting our review, we find no errors that require corrective action.
DECREE
For the reasons set forth above, we affirm the defendant's convictions and sentences.
AFFIRMED.
NOTES
[1] Gayle was not tried with the defendant, and this appeal pertains only to Kenneth Vincent. Gayle is also spelled "Gale" in the record.
[2] The jury returned a verdict of attempted distribution of hydrocodone on count two for the charges pertaining to this date.
[3] The defendant admitted that he had prior convictions for three counts of manslaughter, served approximately 21 years in jail, and was released in November of 2001.
[4] Prior to trial, the defendant filed a pro se motion to suppress evidence, as well as a motion to suppress evidence through his attorney.
[5] State's Exhibit 15 is a taped recording dated October 1, 2002. It indicates the Agent was "Sandra Gayle" and that the targets were "Sandra Gayle and Kenneth Vincent."